Brutus Trading, LLC Mr. Leventhal, you have reserved two minutes for rebuttal, so you may proceed. Yes, Your Honor. May it please the Court, John Leventhal for the appellant Brutus. This appeal is not about proving fraud on the merits. It's about whether Brutus has demonstrated a substantial threshold showing that the government misled the district court by denying the existence of extensive evidence of Standard Chartered Bank's illegal transactions with Iranian entities and terrorist organizations after 2007 and entitling Brutus to discovery. This appeal is not about the government's investigation, but about its credibility. Brutus made that threshold showing, and I'll show you in a minute, referring to the record. The categorical statements that it was only winding down transactions or U-turn transactions and they couldn't find anything in the spreadsheets and the sundry is untrue. But the showing you need to make is that this was a falsehood, a deliberate lie, a fraud on the court. Right? That's what it takes to get to reopen the judgment. It's not enough that they were wrong, they were negligent, the investigation wasn't good enough. I agree with you. It's not about how good their investigation was. It's about what is it from which we could reasonably infer that this was a deliberate falsehood. And I will get to that right now, Your Honor. What we're saying is that the FBI with all its resources, Comor and Manfield from OFAC, they basically said this was wind down transactions, this was U-turn transactions. It's simply not true. I would ask you to go to the record. Can you just unpack that and explain to me what is a U-turn transaction and what is not and what is the evidence that contradicts some – tell me specifically, this is what the FBI agents said. Here is exactly what the proof is and this was something that must have been known to that officer when he made that statement. I would ask you to go to 153 of the record. And first, Bank of Alger, 46 transactions, interest rate swap, FedEx option swap. These are moving forward transactions. These are not looking back. These are not winding down. These entail 632 million. This was disclosed by Brutus and Julius Knight. But you say this is based – this is the allegation in your motion, right? The following table based on the newly extracted data. Yes. So what shows that that table or the evidence that the information that is in that table was specifically known to a government agent? Well, the government agent said that they went to the spreadsheets, that he couldn't find anything in there and he looked at it. That was Comar. Comar is the only one who really went into this and he said he couldn't find anything. That's unbelievable. There are the – You didn't find it until years later. That's true. And that's what we can get to later on about diligence. I'm not talking about diligence at this moment. I'm just saying – you're saying this was manifest and obvious and so they must have known it. But it's referred to as the newly extracted data. And at least as I understand it, there was something hidden about this. I don't understand exactly how that works, not being a computer expert. It's true. And I'd like you to explain it to me. Okay. These are table cache pivot tables where you'd have to go into the Excel and go behind them and you have to have an expert. And the government doesn't deny you need a technical specialist with expertise in this area, as Scantling is. I mean, he submitted a whole declaration about his expertise, which was great, Department of Defense, a lot of government entities. But the fact of the matter is – Well, he's the FBI. They should have that expertise. I've lived with the FBI. I mean, they're really good at a lot of things. And sometimes they're not so good. But they have a lot of – I'm sorry. I'm trying to – I asked a specific question. You said that your expert had all this expertise and that's why he was able to uncover it. I'm not saying you were not diligent for not finding it. I'm saying what is the evidence that the FBI agent who submitted the affidavit did have that expertise? Well, let me just say – Is it just he's with the FBI, he must? Well, you have a governmental agency saying they conducted – they looked at the FSLX-Sundry and they didn't find anything. And he found so much. He found so much. They looked at it and they didn't find anything. What did they look at? They said they did an extensive investigation. Then they quibble and they say, oh, we only looked at what Brutus identified for Iranian. But we gave them so much. And they basically point blank said we only saw wind-down. If you look at this, it's not simply wind-down. But there's nothing that says that they looked at this. This is something that you prepared or your expert prepared long after that fact. That doesn't mean they didn't know it. But I'm trying to understand why you are so confident that they didn't know it and they lied about it. But what we made, what we thought, we made a threshold showing that we should have had discovery, that there was fraud on the FBI. Let me give you another example. What do you think is the nature of the threshold showing? Because normally, I mean, discovery is hardly routine in a Rule 60 motion, right? It's asking to undo a judgment that has already happened. And what is required to get it is a showing that there was deliberate fraud on the court. Now, I understand that it might be, there might be cases where enough has been shown that while you can't quite get there yet, you should be allowed to make an inquiry. But what do you think is the standard for that? How should we define the standard as to when, short of a showing, that leads one to infer that likely this is what happened? What is it that? Can I give you three other examples that might help me out here? I'm trying to understand what the standard is that you are proposing for how close do you have to get in order to have made what you're calling a threshold showing that entitles you to discovery in a Rule 60B motion? Well, we also showed that during the monetary crisis, when there was a loan of $2 billion and a half under the Term Action Facility Program from the Federal Reserve Bank, that very day SED processed a foreign exchange transaction worth more than $14.5 million with the Bank of Algeria. And we have the account numbers in there. And I would ask you to look at Joint Appendix 176 to 177 at paragraph 150. And I would also like to show you that they charge a banking commission fee of more than $500,000 when they being whom? SCB. SCB. That may give SCB some sort of motive to lie about God knows what, anything, or engage in any kind of illegal transaction. What does that tell us? I don't know about that, Your Honor, because it was in the – it was – this is Euro African Bank limited deals in 2009 and 2010 when only an 825 commission. When you have such gouging fees, you would think that there was some kind of illegal transaction. Why do you get 500,000 when a normal fee is $825? Now, I have to tell you also that Scantling revealed that there was billions of dollars of illegal Iranian transactions in these spreadsheets. And I would submit to you, Your Honor, that the government has an obligation – let me – they say that they had another investigation later on because some other bank was being investigated and they found out that SCB was lying to them again, and that's why they enter into the 2019. Right. When you think they would go back into the information that we provided at that point when you have a recidivist liar who has violated Iranian sanctions violations, they know they lied once. So they get $200 billion the first time. Then they get another 200 the second time. And you're saying that at that point, they deliberately decided to lie to the court so that they would not be obliged to go back a third time and get another $200 billion just because they don't want you to get a cut of that? In 2018 – 2018, we bring the first amended – the complaint 2018, which was later amended. Yeah. We submit to you that when they are investigating SCB again before 2019 deferred prosecution, they should go back into the information that we gave them. Maybe they should, but you have to make – ultimately – Does it make sense that they wouldn't if they weren't misleading the court? If I were to tell you that – I'm still trying to understand what is the reason why we would think that the government went back, did another investigation, uncovered another $200 billion. Do you want me to tell you what I think? Yeah, I want to know what you think. The government is then negotiating the Iranian deal. And you saw what we put in the supplemental appendix, what Grassley did. I know it's after that. But that didn't keep them from prosecuting or investigating SCB, making an allegation that they had gone back to the same misconduct, and extracting $200 billion from it. They didn't want to show that they were also dealing with the Taliban, where we were getting killed in Afghanistan. They didn't want to show that they were dealing with the Iranian National Guard. Because they wanted to protect SCB. So you're saying they went back because they wanted to protect the Iranian National Guard?  Because they wanted to protect the negotiations for the Iranian nuclear deal. That's my – you asked me what I thought, and I'm telling you what I thought. That's what the court should have inferred, is that that was the reason why – Let's go into it. Give discovery. Let's find out. They only asked for discovery at the beginning to do EBTs of the four persons, look at certain documents. Then later on, later on in the case, they said, okay, let us just do an EBT of Danny Alter of the Department of Financial Services, because he was the one who told the bank, don't release all your other documents. We think there's more to it here. And the government just shut him out. They just shut him out and – You have to show, among other things, that the government prevented you from fully and fairly presenting your case. Okay. And so, I mean, why isn't that alone a hurdle you can't get over? I mean, this is – I mean, you didn't look at these materials, but you had them in your possession for years. This is the diligence point, Your Honor. Really? I mean, I think you have to show that the government caused you – to be unable to present your case. Your Honor, this Court in – cites the approval of the Bain case in United States – You have to show diligence as well. Right. But you also have to show causation. You have to show that the government prevented you from doing this. And so – Do we have to show that if the hidden evidence can qualify as newly discovered evidence, even if the evidence was known to exist but not accessible? That's what this Court has said in Forbes. And if this is newly – the government doesn't dispute that it's very hard and you need special expertise to – For fraud on the Court, you have to show that the government prevented you from presenting your case. Am I wrong about that? I'm not sure I have to show that, other than the government knew what was going on. And the government should have known. I mean, if you see – So if the government gives you a big pile of documents and they know what's in there and you just don't look at them, then the government prevented you from presenting your case to the Court? We were not – That would be a fraud by the government? The government's burden on that would be we were negligent. We were not negligent. We processed this as soon as we could with an expert from the Department of Defense. The government, with their expertise, they have never come forward to this Court or any Court and said what's in that data. You would think that they – now that they've seen that, they would try to decloak that data. It makes no sense at all. It really doesn't. Wouldn't they – Before you sit down – Now with Exhibit K. Before you sit down, I hope you will address the issue of the unsealing of the Exhibit K.  Yes. First of all, we have our own First Amendment right. We received this outside of litigation, outside of discovery. And we should – you know, as an abundance of caution, we haven't released it yet. Everyone really wants it. But what's preventing you from – Yes, that's the question I like to ask. Well, nothing is preventing us, really, from releasing it. So then how do you have standing? Well, we do have standing because we're a party to this litigation. Well, I know you're a party to this litigation. But if you're not going to be injured because there's nothing that prevents you from sharing this information, then why does unsealing pose a problem? Well, to put it another way, maybe Exhibit K is sealed, and so you can't say to the world here's what's in Exhibit K. But what prevents you from – if these were your documents in the first place that you legitimately had, these aren't things that you got in discovery under some kind of protective order. Correct. These are things that you had before this litigation started. You would have had a right, you're telling me, and I suspect you're right. Well, this is like a prior restraint, Your Honor. Why is there a restraint? Well, the restraint is that these documents that are in the court's possession are sealed. But why does that prevent you from disclosing to the public something that you had before there ever was a litigation? You gave it to the court. You have the information. Well, don't forget there's a presumption of public access on the First Amendment in the common law. And this was a document – this was a document. I understand. I understand. It's the underpinning. I understand that. I'm just trying to understand what is the prejudice to you as opposed to the general public from this sealing, because – and I think what you said in your brief was that it impinges on your First Amendment right to share this information with the public. And I'm asking why would that be the case? Why would the fact that the document is sealed in the court record prevent you from sharing with, you know, some investigative reporter? It doesn't, but the court did not make – So you – I'm sorry. I just want to make clear I understand that answer you just gave. You say it doesn't. You understand that the court's order does not bar you from disclosing the information that you put into Exhibit K? We believe so. It was – and that was the factual foundation. So you're saying you are not prevented from making the – from publicizing that material by the court's order. No, but the court – that's correct. But the court erred. Well, then – Let me tell you, if I may, the court erred because it didn't make a detailed – It didn't do – it didn't comply with the Lugash case. Right. Okay. So that's right. So then it should be unsealed in any event. The newspapers – But the newspapers didn't appeal. Well, they put an amicus in. Okay. All right? I know they didn't appeal, but they put an amicus in. And I know – So they could make an application. They could go back to the district court and make another application. Well, I think – I think, yeah, you'd have to say that in due – in all respect, Judge Agelmar did not make a detailed – I hear what you're saying. Yeah. Yeah. Okay. So – and it is the judicial document of the factual foundation of Brutus' motion. Twice Brutus said that this document is the core evidence supporting the motion. So it's really integral to the 60D motion. But I have to – I just want to – I know I have two minutes to rebuttal. You acknowledge that you can – you cannot say you are forbidden by the court's order from saying this information was part of Exhibit K, it was part of the district court record from which these rulings were made. But you are free just to release the information when – Yes, but I also think that we should be free to – if the court – You should be free to criticize the court by pointing out not only that we're criticizing the government because we think they should have investigated this material and this shows a terrible scandal and whatever. Right. But you also should be able to say that the court is trying to cover this up because the court sealed it and wouldn't let it be released to the press. And if you, the public, understand what is in these documents and what was presented to the court, you will be unhappy with the district court and maybe you'll be unhappy with the court of appeals if they affirm what the district court did. Well, that's what the First Amendment – And you're entitled to say that. Right. Right. And the First Amendment protects us in that regard. All right. Well, we've gone over, but we have questions. So we'll now hear from – I guess we'll begin with Mr. Perez-Marquez. Your Honor, I believe we switched our order.  So, David Barnea, Mr. Marquez. It's Barnea, yes.  Sorry. May it please the Court, J.D. Barnea from the U.S. Attorney's Office to the Government. The relator in this case falsely accuses the government of having committed fraud on the court in a last-ditch attempt to undo the dismissal of its action. The district court saw through this evidence-free accusation, and this court should affirm. Both the district court and this court previously rejected Brutus' nearly identical claims of fraud on the court in the prior appeal in this very case. Brutus' latest argument collapses under its own weight. In 2012 and 2013, Brutus brought to the government specific transactions with particular Standard Chartered Bank clients that it claimed violated the Iran sanctions rules. The government extensively investigated those transactions and client relationships and concluded there were no sanctions violations. Now, over a decade later, Brutus claims to have decloaked completely different sanctions violations. But somehow, it was fraud on the court that the government did not investigate these newly identified transactions years earlier, or that the government correctly reported to the district court that its investigation back then was limited to the transactions and client relationships Brutus identified at the time. The government in this declarance made no incorrect or fraudulent statements to the district court in this case, and Brutus' baseless accusations should thus be rejected. I'm happy to answer any court's questions, but I'm also happy to just sit down if the court doesn't have any. Well, what do you have to say about the unsealing? The government has taken no position on the unsealing in either court. So maybe we need to hear about that from your colleague who is representing the bank. Thank you, Your Honor. May it please the Court. Antonio Perez Marquez from Davis Polk & Wardwell for Standard Chartered Bank. I'm going to focus only on sealing, and I'd like to address two points. The first is Relator's lack of appellate standing. And the second, that there was no abuse of discretion by Judge Engelmeyer in denying the motion to unseal. First, on Relator's lack of appellate standing. This court in Tacayona was very clear. Appellate standing requires a personal and individual injury that is caused by the order under appeal. Relator has none. Do you agree, then, that one of the reasons there's no injury is that the Relator is perfectly entitled to go to the New York Times tomorrow and say, here's the documents that we have had in our possession since way back when. Here's the decoding that we've recently done about this. And by the way, we submitted this to a court, and the court spat on us the same way the government did. Are you entitled to do that? I would refine that, Your Honor. And what I would say is that the sealing order did not impose any restrictions on Relator's ability to share. You may have some other – I mean, I don't know how they got these documents in the first place. And maybe they don't have that right for some completely different reason because these were stolen documents and you have every right to sue them if they do go to the New York Times. But what you cannot do – do you agree with this? What you cannot do is say they are in contempt of Judge Engelmeyer's sealing order. That's exactly right, Your Honor. So they have preexisting restrictions on their ability to share, which indeed arise from how these documents were obtained. These are confidential banking records that were taken from the bank. And that may be so or may not be so because we don't know. There's nothing in the record. This has never been explored. How did they get this and was it proper? That would be if they did go to the New York Times and you wanted to sue them over it, that's what that case would be about. But you are agreeing that nothing in Judge Engelmeyer's sealing order would prevent them from doing it and you can't go in that projected future lawsuit if they choose to do that sort of thing and exercise what they think are their First Amendment rights to do that. The one thing you can't do is say, and besides that, they should be held in contempt because this violates the sealing order. Exactly. They would not be in contempt of the sealing order because the sealing order did not impose any restrictions on their ability to share. That distinguishes this case from the cases on which they rely, like Bridge v. Catt and Parker v. Columbia Broadcasting, those concerned protective orders in which the court explicitly restricted the party's ability to share information. There is no such restriction in this case imposed by the sealing order. The sealing order, all it did was a memo endorsement on their letter seeking sealing. It didn't impose any restrictions on sharing and there's no restriction on their access to the document imposed by the sealing order. They have no injury caused by the order under appeal and therefore have no appellate standing. If the various media amici had wanted to do something about it, they could have appealed the order because they were, they had made a motion in the district court and it was denied. And they chose not to do that, Your Honor. And they chose not to come here. Yes, Your Honor. They didn't come to us with their problems. Exactly, Your Honor. The bank joined, I'm sorry, the plaintiff joined in the application. The court asked how the parties felt about the Times Media's motion and the plaintiff said he joined in the motion. That's correct, Your Honor. The relator did join in the Times Media's motion to unseal. But the question for appellate standing is whether they were injured, whether they have an injury that arises from the order. And they have none. They don't have any injury that was caused by the order because their access to the document was not limited. Why isn't it an injury to be forbidden to disclose that this was part of Exhibit K, that this is what Exhibit K contained? This is something, I mean, they, without that order, they would have had the right to say this is what Exhibit K contained. I'm disclosing Exhibit K, but because of the order, they can't do that. Why isn't that an injury? Why doesn't that restrain their First Amendment privilege to disclose court documents? Well, Your Honor, it's because there were restrictions that existed prior to the entry of the sealing order. Wait, wait, wait, wait, wait, wait. Yes. Let's be very clear. I thought you told me the exact opposite of what Judge LaValle was saying. I thought you told me that they would be entitled to say this is what is in Exhibit K in their effort to criticize the court as well as their effort to criticize the bank and the government, and that the only thing that you are saying is that because these documents were stolen, they didn't have a right to do anything whatsoever. They didn't have a right before this case began to go playing around with these documents or send them to the New York Times or whatever, and they still don't have that right. That's what you are preserving, but you are agreeing not just that they can disclose the contents of certain documents that they have, legally or otherwise, and they are also not restrained from saying this is what is in Exhibit K if they choose to do that by anything in Judge Engelmeyer's order. Do I correctly understand your position? Well, as I understand the Court's decision in Bridge v. Katzkand, a sealing order has the effect of protecting only the version of the document that is cloaked in judicial garb, which is the language of this Court in that decision. Well, but that seems to be a fudge. I'm asking a very, very specific question, and I'm not sure I'm making myself clear as to what the question is. In many of the cases that we have had, the situation has been that a party to a litigation seeks something in discovery from another party into the litigation. They have no right to see those documents except because of the discovery order, and there is a protective order that's placed on them. And that protective order says from the get-go, you can't go running to the New York Times with this. You can't use this for any other purpose than if it becomes something you want to use in this litigation. That's the kind of sealing order that we mostly have dealt with. Here we have the unusual situation that this is the party that presented these documents to the Court in the first place. They didn't get it through discovery from the bank. They got it some other way. We don't know what that way is. It may have been legal. It may have been illegal as far as I'm concerned. We don't know anything about that. They presented it to the Court. The Court then puts it under seal. The fact that it's under seal means that if the New York Times or the Times of London wants to get access to that document, they have to go to the Court and ask for it. On the other hand, if instead they ask the relator, the question is, what can the relator do? Or what can the relator do whether they ask for it or not? As far as Judge Engelmeyer's order is concerned, putting aside any other rights the bank may have to try and prevent them from disseminating it in some way, do you agree that nothing in Judge Engelmeyer's order keeps them from saying, A, here is all the documents that we had, and that shows that Standard Bank is a traitor to the United States? And, B, we presented that argument to the Court, and the Court just rejected our efforts to litigate this issue, and we called it Exhibit K. And I thought you told me that as far as you are concerned, at least, any effort you might make to interfere with or penalize them for disseminating this any way they want could not depend on Judge Engelmeyer's order. It could only depend on whatever preexisting rights and wrongs there were as between you and the relator as to how they got the documents. Yes. Is that correct? I think I understand the question, so let me answer it as clearly as I can. The first part of it — As clearly as you say would be yes or no. Yes. So they are at liberty, to the extent — to whatever extent they were or were not at liberty prior to the sealing order, to share or not to share the copy of those documents that they have. I do not believe they are at liberty to tell the press, here are the contents of Exhibit K — Well, if that's the case, then — — when that is under seal. And if that's the case, then why don't they have standing to raise that issue here? Because what they want to do in terms of their First Amendment rights is not just to smear you with the bad deeds that you allegedly did. They also want to argue that the Court failed in its responsibilities. That's something that a party has a First Amendment right to do, to criticize the courts. So why would Judge Engelmeyer's sealing of these documents, whether — why shouldn't we have to decide whether it was right or wrong for the judge to say, you can't criticize me for my ruling by exposing to the public what evidence I disregarded, because that material should be under seal? Yes. Whether that's right or wrong, don't they have standing to challenge that interpretation of the order? The reason that does not confer standing on Relator is because that would be, at most, an injury to the public right of access, which, under Hollingsworth, they do not have standing to enforce. And if what we're saying is that the problem here, the injury, is that Times Media cannot get access to know exactly what is Exhibit K — I don't care about — — that is a public injury. I don't care about Times Media's right. I'm caring, at this point, about their argument that they are prevented from criticizing the court about the court's ruling, whatever it may be. And let's assume, for the purposes of the argument, that the court's ruling — well, we know it was a ruling against them in the district court, and let's assume that that ruling is affirmed by us. Why don't they have a First Amendment right to take this issue to the court, or at least — at least, what I really mean to ask is, why don't they have standing to raise the argument that if Judge Engelmeyer's order is interpreted as preventing them from doing that, then they at least have standing to ask us to decide whether Judge Engelmeyer's sealing order was correct? Yes, Your Honor. The way I would answer that question is that they have not identified a single case in which appellate standing in this context has arisen simply from — No, that's not an answer. That's not an answer. I mean, there's — no two cases are identical, and everybody could always make that argument. There's never a case where somebody couldn't say — there's never been a case that ruled exactly what's involved here. But, I mean, how can — I don't understand how you can argue that there's no injury. They have — without the sealing, they would have the perfect right to go to the press and say, this is Exhibit K, and use that for whatever purposes they want, to criticize the court, to show that the court was kowtowing to the government, whatever, whatever they wanted to argue. After the order, they can't. You acknowledge that they're not allowed to disclose what Exhibit K is. So why — how can you say that's not an injury? Under one circumstance, do they have the right to do it? Under the other circumstance, they don't. The court orders it. The court says, no, this is going to remain sealed. You have joined, in times, media's request to unseal, but I'm denying that. It remains sealed. Yes, Your Honor. My answer to that question would remain that I believe that that is, at most, an injury to the public interest, and therefore doesn't confer standing on them. And I know I'm over time, but I would like to address the abuse of discretion issue, if I may, for just a moment, because the decision — Judge Engelmeyer's decision to deny the motion to unseal is subject to an abuse of discretion standard. The court's decision that banking records should remain sealed to protect the privacy interests of third parties was well within the range of permissible decisions and was indeed correct. Exhibit K is not a document. It's 200-ish spreadsheets. Millions of transactions for thousands of customers. Quintessentially the type of information that is properly sealed, and we've collected cases. Why wouldn't that be handleable by redaction? Originally, they claim — I don't know if this is right or not, because the district court didn't really do the full analysis. They claim that they originally joined in the sealing order for exactly the reason that you suggested, because there are lots of innocent parties whose privacy would be invaded, and they thought at that time it was impractical to do redactions. Now they say it is practical. They could redact all of the irrelevant material, all of the transactions of people that nobody is accusing of violating the sanctions regime. But the whole point of this case is that there is evidence that shows that Standard Charter was violating the sanctions regime to a degree that was previously unknown to the public. And the court's substantive order, right or wrong, on the merits of their Rule 60 motion is impeding the discovery of that information by the public. And why — you know, maybe — you know, the premise of this whole thing is that we are — if we reverse on the merits, we don't get here. So I'm not saying what I think about the merits. I'm just saying the premise of the sealing question really is, suppose we affirm and say Judge Engelmeyer was right not to reopen the case. And we're assuming — so we'll assume for this purpose that it is right for reasons of finality or the meaning of Rule 60 or the basis of their showing that the district court got that correct. But they have a right to criticize that. And, you know, the balancing was never really done by the district court. So I'm not even saying that we would have to conclude or we should conclude in any way that these documents should be unsealed. But the question is, have they been injured in their claim? Have they been injured because they say they should have a right to let this go? And the answer to whether there's an abuse of discretion really lies, it seems to me, in a balancing of the rights of not me, if I happen to have an account with Standard Charter, and that shows up somewhere in the vast spreadsheets that you talk about, but balancing the rights of people who have been accused of violating the law against the public interest in knowing. That's a legitimate question. And it has to be under lugash. There's a process for addressing that. And it seems to me the district court didn't actually do that. Well, Your Honor, let me explain the question you opened with, which is why not redaction? And redaction here just doesn't work. Well, maybe that will be the answer if we do the balancing. We're still talking here just about the question of standing and whether it's necessary to do that balancing. Yes, Your Honor. I meant to shift to the merits of this question as distinct from standing. And on the issue of redaction, redaction just doesn't work here. And they themselves have argued to this court, it's page 19 of their appellate brief, that there are too many names to redact. Now, what they say in their reply brief at page 22 is that they want to redact all data that does not involve the bank's sanctions violations. Now, our position is there are no sanctions violations. The government has identified no sanctions violations. What the government has said instead is that relators throughout this litigation espoused an incorrect understanding of the relevant sanctions rules. So what they are proposing under the guise of redaction is that the court, or they broach the idea of a special master, would actually have to call balls and strikes on these millions of transactions, and the ones that are sanctions violations would be open to the public, and the ones that are not would remain under seal. There is no precedent for that kind of process. It's an enormously burdensome process that in a case that has already been dismissed for being factually deficient and based on a nonviable legal theory would be, frankly, outrageous to say, okay, well, now let's determine whether there are sanctions violations here for the purposes of redaction. They've never proposed a redacted version of these spreadsheets. For good reason. There is no workable way to do it. I'm sorry. I want to go back to your claim of Article 3 because it seems to me that you are misusing Article 3. Article 3 is about whether a court may hear a case. Article 3 determines whether a court has the power to issue an order because if what's being demanded of the court is something that the plaintiff, the person who seeks the order, has no interest in, then the court is deemed not to have the power because the court can only decide cases and controversies and give advisory opinion. There's no doubt. I agree with the aspect of your claim that Article 3 continues to apply throughout the litigation so that if at some point the person who's asking for relief no longer has an interest in it, no longer is injured, then the court loses the power to decide the case. And that can mean that the appeals court doesn't have standing for an appeal and can't hear the appeal. But there's no doubt that we can hear this appeal. You're saying you're abandoning that function of Article 3 to decide whether the court has the power to hear this case, and you're applying it to every order the court might make. Now, courts make tons of orders that no one has a particular injury that would satisfy Article 3 to demand it. Courts decide all kinds of procedural things and other things, and this case is properly before us. But you're saying a particular issue that a party is seeking to overturn, that we have to apply Article 3 to every order that the district court may, and the appeal of it. That's not what Article 3 is about. And, I mean, if in the district court the case is properly before the court, and let's say, well, I remember when I was a district judge, one day the lawyers asked me, can we adjourn early today? Can we adjourn early? Why? The reason was because we have a lot of kids who are witnesses and they want to, it's Halloween, they want to go off and be able to trick-or-treat. Was the proper thing for me to do as the district judge to say, I can't decide that question because you, as the plaintiff, don't have an interest in whether these witnesses go home for Halloween? That's outside my, you have no interest in that question, therefore I can't decide it? No, I can decide it, the case is properly before me, and I can decide any question that comes up in the case. Here, this appeal is properly before us, and one of the issues that's being raised is the unsealing of that order. Now, there are standing issues that don't come from Article 3 that come from other sources. But Article 3, which is the only source you've claimed, Article 3 doesn't control our ability to decide whether this litigant can appeal from the denial of an unsealing order. Your Honor, I understand what you've recited. Let me add one other thing. Yes. If Article 3 says that this litigant can't ask for the unsealing of it because it has no interest in whether these documents are disclosed or not, by the same token, Article 3 would then say that the court couldn't have sealed the documents in the first place because the court sealed them in the first place on the application of the plaintiff. Well, Your Honor, I'm If they don't have an interest now, they didn't have an interest then either because it's no business of theirs whether they're sealed or not. So that order also would have to be vacated, wouldn't it? The way this Court has framed the definition of appellate standing in the Tacciona case was that the appellant must have an injury that is caused by the order under appeal. We interpret that in this case to mean the unsealing order. The Court of Appeals can hear the appeal.  There's no doubt that we have the appeal. There's no doubt that there are issues as to which there is standing that justify the appeal. You're not saying dismiss this whole appeal. No, the order with respect to sealing we view as a distinct standing question, and I understand. Do you have a case? Is there ever a case? It would be the Tacciona case that I'm relying on, that the order under appeal Is there a case that involved dismissing the whole appeal because there was no standing, no issue in the appeal was justified by a party's standing to object to it? I don't recall, Your Honor, whether it was a partial, but we view the There were two motions here that were addressed in the District Court's decision. One was on the motion to unseal. The other was on the Rule 60 motion. We believe there needs to be Article III standing to appeal for each of those orders. If I may make just one final point on the merits as to the question of whether this is a judicial document, I would direct the Court to this Court's Newsday decision, which we think is highly analogous. Newsday concerned the sealing of an entire report where portions of that report had been testified about in open court. And this Court ruled that although the First Amendment presumption of access did apply to the type of civil contempt proceeding that was at issue in that case, the entire report was not a judicial document because the contents of the report were not necessary to evaluate for the public to understand the merits of the dispute. And we have the same thing here where Relator, in its briefing and in its declaration, has drawn out in detail all the customers and transactions that it contends it put before the government that they didn't act properly on in Relator's view. All of that is out in the open, and that militates strongly towards the conclusion that Exhibit K in its entirety is not a judicial document. Is the appendix in this case sealed? The appendix in this case is not sealed. So the thing that the chart that Mr. Levinson was referring to earlier is open to the public. Is open to the public.  Thank you. What is the case you cited to me? Tacchiona and let me, I've got this cite for you. 386F30205. Yes. Thank you, Your Honor. All right. We'll now hear from Mr. Leventhal for two minutes of rebuttal. Thank you. Let me go first with the sealing. I'll take it in reverse order. Brutus is standing to vindicate its own rights because, number one, it's a party and it was a movement in the district court to unseal Exhibit K. Again, we talked about Seattle Times versus Reinhart, 467 U.S. 20 at 34, and this court in Bridge CAT Scan Associates versus Technicorp, which basically talks about our First Amendment rights as gained through independent means of the court processes, as Your Honor has stated. A prior restraint on New Hope Family Services versus Poole, Second Circuit 2020 case. It's not ancillary. The loss of the First Amendment freedoms unquestionably constitutes irreparable injury. And if I may say that this is a judicial document. Under Brown versus Maxwell, it was relevant to the judicial function, and the test is not whether it was relied upon. So it is a judicial document. And if I may just say. Anything that is sent to a court is a judicial document by your thinking, it would seem to me. No, this is the underpinning. We've said twice this is the core function of the Rule 60D. This is the core evidence. Twice we said that. This was the whole litigation was whether we can rely on. At a minimum, it is relevant to the decision, right? I'm sorry, Your Honor? At a minimum, it is relevant to the decision. You may be taking on more than you need. Yes. I said it doesn't have to be relied upon. It just has to be relevant. And that's the Brown versus Maxwell case. And assuming, arguendo, that you think it is not a judicial document, then the Court's nondisclosure order infringed upon our First Amendment rights and was contrary to historic principles of equity, as articulated by this Court in the Bridge case that I already cited. Now, regarding the damages by the government, the government said that it found no post-2007 foreign exchange transaction by SEB's Iranian clients using the bank's AOLT3 online system. And that's at JA71, paragraphs 35 to 37. That's Manfield. And Comar at page 79, I'm sorry, also Manfield at 79 in paragraph 55, and Comar 113, paragraph 13. But Brutus' forensic analysis that in 2008, approximately 13,000 foreign exchange transactions were completed by Iranian-related clients using that system. And that's at JA207 at paragraph 77 and 238 at paragraphs 24 to 25. So it's clear that there is a threshold here. And the Court seems to indicate that the government didn't prevent us. The government says, we looked at that. We didn't find anything. They looked at it? What did they do? They also said they conducted an extensive investigation. How can it be so? But how did that prevent you from doing your own investigation? Well, we pointed out that they could easily find that $500,000 commission way out of line through an 825 commission. It was indicative. That's Sianta, really, right there. But that doesn't go to they're preventing you from doing something, I guess. I mean, maybe you're saying that that's not. I'm saying they lied to the Court. I'm sorry, Your Honor, I shouldn't talk over you. No, I guess you keep suggesting these things that are indicative of their knowledge are also evidence of their preventing you from making arguments to the Court. No, I'm saying they made a fraud on the Court by saying that they didn't find anything. Some things are so obvious. Two things I just showed you now were so obvious. If the Court would let me, I would give you a whole litany of pages of the record where there's contradictions. Well, hopefully you did that and you agree. Okay. But in any event, this is clear. The government is silent now. They didn't. Now we told them how to decloak the data. Did they do it? I think that's indicative of Sianta. How could they not do that? Why don't they care that SCB Bank was trying to quash this document? You know, this is not just in this country. You'll see paragraph 125 of one of the documents. We allude to the United Kingdom's all over them, too. So this is they want to quash this. They'll pay anything to quash this. They don't want this to come out. All right. Well, thank you all. We will resume the decision. Thank you. The next case, please.